IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SALLY L. BOULANGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) Civ. No. 06-333 SLR | |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Gary L. Smith, Wilmington, Delaware.  Counsel for Plaintiff.

Colm F. Connolly and David F. Chermol, of the Social Security Administration, Philadelphia, Pennsylvania.  Counsel for Defendant.  Of Counsel:  Michael McGaughran and Kenneth DiVito, of the Social Security Administration, Philadelphia, Pennsylvania.

**MEMORANDUM OPINION**

Dated: October 30, 2007
Wilmington, Delaware

---

[1]On February 12, 2007, Michael J. Astrue replaced Jo Anne B. Barnhart as Commissioner of Social Security.

*Sue L. Robinson*

**ROBINSON, District Judge**

## I. INTRODUCTION

Sally L. Boulanger ("plaintiff") appeals from a decision of Michael J. Astrue, the Commissioner of Social Security (the "Commissioner"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff has filed a motion for summary judgment asking the court to award her DIB benefits or, alternatively, remand the case for further proceedings. (D.I. 2 at 2; D.I. 13 at 17) Defendant has filed a cross-motion for summary judgment, requesting the court to affirm his decision and enter judgment in his favor. (D.I. 15 at 22) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).[2]

## II. BACKGROUND

### A. Procedural History

On September 16, 2002, plaintiff filed an application for DIB alleging disability beginning on August 17, 2002. (D.I. 10 at 149, 175) Plaintiff asserted disability due to diabetes, asthma, carpal tunnel syndrome, back problems, joint swelling, migraines and colitis of the stomach, among other things. (Id.) Plaintiff's application was denied initially and on reconsideration. (Id. at 119, 124) A hearing was held on October 28,

_____

[2] Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . .

42 U.S.C. § 405(g).

2

2003 before administrative law judge, Timothy C. Pace.  (Id. at 34, 110)  On December 22, 2003, the administrative law judge issued an unfavorable decision finding plaintiff not disabled and denying plaintiff's claim for DIB.  (Id. at 118)  On appeal, the Appeals Council granted plaintiff's request for review and remanded the case for another hearing and a new decision based, in part, on additional evidence provided by plaintiff. (Id. at 145-46)

On June 2, 2005, a supplemental hearing was held before administrative law judge, Melvin Benitz ("ALJ").  (Id. at 20, 24, 65)  Plaintiff and a vocational expert testified at this hearing.  (Id. at 65-104)  On September 13, 2005, the ALJ issued a decision denying plaintiff's claim for DIB.  (Id. at 24)  The ALJ concluded that plaintiff could perform low stress sedentary work, requiring low memory and concentration with allowances for leg elevation, because work existed in significant numbers for an individual with these, and other, functional limitations.  (Id. at 28-29)  The ALJ found that plaintiff suffered from multiple severe impairments, including diabetes, lupus, depression and anxiety, and obesity.  (Id. at 25)  More specifically, the ALJ made the following findings:

> 1.  The claimant meets the non-disability requirements for a period of disability and disability insurance benefits set forth in section 216(i) of the Social Security Act through December 31, 2006.
>
> 2.  The claimant has not engaged in substantial gainful activity since August 17, 2002 (20 C.F.R. § 404.1520(b)).
>
> 3.  The claimant has the following severe impairments: diabetes, lupus, depression and anxiety, and obesity (20 C.F.R. § 404.1520(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1, Regulations No. 4 (20 C.F.R. §

3

404.1520(d)).

5.  Upon careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary exertional work with a sit or stand option, limited pushing and pulling, and no prolonged climbing, balancing, stooping, or stair climbing, or concentrated exposure to heights and moving machinery due to her imbalance, and requiring low memory, low concentration, and involving low stress work, and allowing for occasional leg elevation, with limited exposure to fumes, odors, dusts, gases, and other pulmonary irritants.

6.  The claimant is unable to perform any past relevant work (20 C.F.R. § 401.1565).

7.  The claimant was born on February 6, 1973 and was 28 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 C.F.R. § 404.1563).

8.  The claimant has a limited education but is able to communicate in English (20 C.F.R. § 404.1564).

9.  According to the vocational expert, there would be some general clerical skills transferable to sedentary work but because of the claimant's age, transferability of skills is not an issue material in this case (20 C.F.R. § 404.1568).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 C.F.R. §§ 404.1560(c) and 404.1566).

11.  The claimant has not been under a "disability," as defined in the Social Security Act, from August 17, 2002 through the date of this decision (20 C.F.R. § 404.1520(g)).[3]

(Id. at 25-31)  In summary, the ALJ concluded that the plaintiff's claimed functional

limitations were not completely credible when considered with the objective evidence of

---

[3]The ALJ's rationale, which was interspersed throughout the findings, is omitted from this recitation.

record as a whole.[4]  (D.I. 10 at 28-29)   The ALJ likewise found plaintiff's treating

physician's opinion unpersuasive because it lacked support from the objective medical

evidence in the record.  (Id. at 28)  Similarly, the ALJ rejected plaintiff's treating

psychiatrist's opinion because it was conclusory and inadequately supported by clinical

findings.  (Id. at 29)  On September 15, 2005, plaintiff appealed the ALJ's decision to

the Appeals Council who declined to review the decision, making it a final decision

reviewable by this court.  (Id. at 8, 18)  Plaintiff filed the present action on May 19,

2006.  (D.I. 2 at 1-2)

### B. Documentary Evidence

Plaintiff claimed disability, starting in August 2002, due to several medical

conditions.  (D.I. 10 at 69, 175)  Plaintiff's ailments include diabetes, asthma, arthritis,

lupus, headaches, back pain and carpal tunnel syndrome.  (Id.)  Plaintiff's primary care

physician, Dr. Pasquale Fucci, examined and treated plaintiff beginning in 1992.  (Id. at

70, 178)  From the alleged disability onset date, Dr. Fucci treated plaintiff for a variety of

complaints.  The medical records indicate that plaintiff suffered from back and knee

pain, asthma, coughs, sore throats, sinus infections and bronchitis between February

2002 and March 2004.  (Id. at 291-327, 387-410)  Throughout this period, Dr. Fucci

also monitored plaintiff's diabetes.  (Id. at 212, 296, 307, 319, 321, 323, 390)  In August

2003, Dr. Fucci prescribed plaintiff a quad cane, which she uses to help maintain her

balance.  (Id. at 76, 218)  During his course of treatment, Dr. Fucci referred plaintiff to

---

[4]Specifically, the ALJ concluded that "the claimant's medically determinable
impairments could reasonably be expected to produce the alleged symptoms.
However, the claimant's statements concerning the intensity, duration and limiting
effects of these symptoms are not entirely credible."  (Id. at 28)

specialists because of her various conditions.

Based on Dr. Fucci's referral, plaintiff saw Dr. Sheerin Javed, a specialist in arthritis and rheumatology, starting in July 2002. (Id. at 177, 212, 258)  Plaintiff complained of soreness, stiffness, and pain in her hands, feet, lower back, and knees. (Id. at 249-52, 258-59, 373-77)   Specifically, she experienced pain and swelling in her hands during the six months prior to her visit and her knees were very stiff. (Id. at 258-59)  Dr. Javed assessed "arthralgias, low back pain, prolonged stiffness and dry mouth."[5] (Id. at 259)  Dr. Javed diagnosed plaintiff with type II diabetes, asthma and obesity. (Id.)  On August 14, 2002 and August 30, 2002, Dr. Javed's notes indicate that plaintiff experienced "poorly controlled" sugars. (Id. at 252)

On October 17, 2002, plaintiff completed a disability report (Id. at 174), work history report (Id. at 184), pain questionnaire (Id. at 192) and a daily activities questionnaire (Id. at 197).  In these various forms, plaintiff indicated that she constantly experienced excruciating pain (80 to 100 percent of the time) and often became emotional due to her pain. (Id. at 182, 192-93)  Plaintiff also stated that her pain medication provides relief for short periods of time. (Id. at 192)  Specifically, the pain medication allows her to sleep for a few hours but she awakes in the early morning because of her pain. (Id. at 182, 193, 195)  Plaintiff also indicated that various other treatments do not alleviate her pain.  In particular, plaintiff stated that she experiences no relief when elevating the affected area or using her TENS unit.[6] (Id. at 194)

---

[5] Arthralgias is neuralgic pain in a joint or joints.

[6]  TENS is an acronym for Transcutaneous Electrical Nerve Stimulator.  It is an electronic device that produces electrical signals used to stimulate nerves through

6

Plaintifff's responses to the questionnaires also provided a depiction of her daily life. (Id. at 174-209)  Plaintiff lives with her two children, her husband, her brother-in-law, her brother-in-law's girlfriend, and their son. (Id. at 193, 198)  Plaintiff does not perform any household chores, which are completed by her brother-in-law's girlfriend, her own children and her husband. (Id. at 193, 198)  She visits with friends on "good days" only, which occur about ten times a month. (Id. at 200)  Additionally, plaintiff stated that she sometimes requires help with personal grooming and experiences anxiety, despair, anger, withdrawal, fatigue, mild crying, guilt and depression throughout the day. (Id. at 194, 202)

On October 25, 2002, Dr. Javed diagnosed plaintiff with diabetic neuropathy, arthralgias of hands, elevated complements and diabetes.[7] (Id. at 250)  Following this diagnosis,  Dr. Javed recommended a referral to an endocrinologist for the peripheral neuropathy and suggested a low dose of an anti-depressant. (Id.)  Dr. Javed's notes indicate that plaintiff is "doing well except for [her] hands and feet," which were stiff. (Id.)

Dr. Fucci also referred plaintiff to the Cardiac Diagnostic Center ("CDC"). (Id. at 240)  On October 30, 2002, plaintiff underwent a myocardial perfusion study at the CDC.[8] (Id. at 239)  The study showed a "moderate to severe defect in the anterior wall that most likely represents attenuation artifact specifically overlying breast tissue." (Id.)

--------

unbroken skin.

[7]Neuropathy is a diseased condition of the nervous system.

[8]A myocardial perfusion study is a procedure that evaluates heart conditions.

7

Further, the report indicated that plaintiff had "impaired functional capacity." (Id. at 240)

In December 2002, plaintiff consulted Dr. Thomas Mueller, a neurologist, to evaluate her low back and neck pain. (Id. at 287-90)  Dr. Mueller's notes reflect plaintiff's representations that the pain disrupted her sleep, that she had increased pain after standing only for a few minutes, and that she experienced cold and numb feet. (Id.)  Additionally, Dr. Mueller's notes indicate that plaintiff complained of severe headaches, occurring two to three times per week and lasting a few hours with nausea, vomiting and photophobia.[9] (Id.)  Dr. Mueller's assessed "chronic low back pain and possible lumber radiculopathy, chronic cervical pain and possible cervical radiculopathy, migraine without aura, diabetes with peripheral neuropathy, hypertension, asthma, hyperlipidemia, and connective tissue disease."[10] (Id. at 290)

In January 2003, plaintiff underwent several tests:  a lumbar spine MRI, a cervical spine MRI, and an EMG of her arms and legs.[11] (Id. at 278, 280-83)  The medical records show a normal lumbar spine MRI and minor degenerative changes in the cervical spine MRI. (Id.)  In Dr. Mueller's opinion, the EMG of plaintiff's arms indicated an equivocal C7 radiculopathy, while an EMG of her legs suggested the possibility of an early/subtle peripheral neuropathy. (Id.)

---

[9] Photophobia is an abnormal sensitivity to or intolerance of light.

[10] Radiculopathy is disease of spinal nerve roots.  Hyperlipidemia occurs when there is an excess of fat or lipids in a person's blood.

[11] An MRI, or magnetic resonance imaging, is a non-invasive method that uses nuclear magnetic resonance to render images of the inside of an object.  An EMG, or electromyography, is a technique that evaluates and records the physiologic properties of muscles.

On January 9, 2003, Dr. Javed evaluated plaintiff during a follow-up visit. (Id. at 249)  Dr. Javed's reports from previous visits indicate that plaintiff experienced aches all over, significant fatigue and stiffness, and tenderness in the joints of her lower and upper extremities.  (Id. at 249-52, 259, 373-74, 376-77)  This progress report stated that plaintiff was "doing relatively well." (Id. at 249)  Dr. Javed noted that plaintiff complained of her hands bothering her every so often but that her hands were much better than before.  (Id.)  Dr. Javed also described improvement in plaintiff's hands from taking the prescription Plaquenil.  (Id. at 249-50, 376)  At this point, Dr. Javed's impression included:  (1)  arthralgias of the hands with improvement on Plaquenil; (2) elevated complements, questionable inflammatory arthritis; (3) diabetic neuropathy; and (4) diabetes mellitus.  (Id. at 249)

Following Dr. Javed's recommendation, plaintiff consulted Dr. Manveen Duggal, an endocrinologist, to treat her diabetes in September 2002. (Id. at 250, 272, 275-76) Dr. Duggal, in January 2003, stated that plaintiff presented numbness and tingling in her feet but that her peripheral neurological was essentially normal.  (Id. at 272) Additionally, Dr. Duggal reported plaintiff's recent use of an insulin pump and noted that it appeared to control her diabetes.[12]  (Id. at 272-73, 278, 295)  On January 10, 2006, Dr. Duggal found plaintiff's diabetes uncontrolled and diagnosed plaintiff with mild/early peri-neuropathy.  (Id. at 276)

In February 2003, Dr. Mueller diagnosed chronic low pack pain, with possible

---

[12] Prior to plaintiff's use of the insulin pump, Dr. Duggal's notes show that plaintiff had uncontrolled diabetes on two prior occasions:  October 8, 2002 and September 10, 2002.  (Id. at 274-75)  In contrast, Dr. Duggal's records indicate that plaintiff's blood sugar levels had improved on November 7, 2002.  (Id. at 274)

lumbar radiculopathy; chronic cervical pain, with possible cervical radiculopathy;

migraine; hypertension; diabetes, with mild peripheral neuropathy; asthma;

hyperlipidemia; possible connective tissue disease; and a history of five or six motor

vehicle accidents.  (Id. at 277)  This follow-up visited revealed a normal motor exam, an

intact sensory exam, a normal tandem gait and symmetric deep tendon reflexes.  (Id. at

278)  Dr. Mueller noted that the plaintiff's sugars, after using an insulin pump, "are

much better controlled."  (Id.)  Further, Dr. Mueller reported that plaintiff experienced

migraines about six times per month and that medication improved the migraines

significantly.  (Id.)  Dr. Mueller suspected that plaintiff had a possible connective tissue

disease because the MRIs of her cervical and lumbar spines were so "strikingly

negative or near normal" and advised plaintiff to follow-up with a rheumatologist.  (Id.)

Specifically, Dr. Mueller found that plaintiff's lumbar spine MRI was normal.  (Id. at 280)

Further, an EMG of the plaintiff's upper and lower extremities was mildly abnormal due

to the presence of mild chronic denervative change in the C7 myotomal distributions,

consistent with radiculopathy.  (Id. at 282)

On March 12, 2003, plaintiff completed a reconsideration disability report.  (Id. at

204-07)  In the report, she stated that she sometimes needed help taking a shower and

that she always needed help with the cooking and cleaning.  (Id. at 206)  Plaintiff also

asserted that "the pain, stiffness, swelling and bruises are almost unbearable."  (Id. at

207)

On March 27, 2003, plaintiff presented feeling poorly to Dr. Javed.  (Id. at 377)

In particular, plaintiff's back and knees caused the most pain and she experienced

"consistent burning in her hands and feet from the diabetic neuropathy."  (Id.)  Dr.

10

Javed noted that her lower back was very restricted.  (Id.)  On May 30, 2007, Dr. Javed reported that plaintiff's left thumb, hand and wrist were "unbearably tender" and noted the possibility that the tenderness existed because plaintiff had been lifting her baby nephews, ages two months and two years.  (Id. at 376)  At this time, Dr. Javed assessed:  inflammatory arthritis, well controlled on Plaquenil; De Quervain's tendinitis; osteoarthritis of knees; and obesity.  (Id. at 376)  Plaintiff participated in some physical therapy sessions for her low back and knees between May and September 2003, but did not notice improvement from the physical therapy.  (Id. at 348-66)

On November 4, 2003, Dr. Duggal found plaintiff's diabetes poorly controlled and suspected that plaintiff was not following some component of her treatment.  (Id. at 446)  On January 14, 2004, Dr. Fucci completed a prescription pad note evidencing his belief that plaintiff, due to her diabetes, could never work.  (Id. at 388)  In February 2004, Dr. Duggal sent a letter to Dr. Fucci reporting his findings that plaintiff's diabetes continued to be uncontrolled and that he hoped she was complying with the prescribed treatment.  (Id. at 448-49)  Dr. Duggal also noted that plaintiff failed to provide him with optimal blood sugar finger stick data and that plaintiff's prior blood sugar reading had been more or less nearer optimal.  (Id. at 448)  Plaintiff's diabetes continued as poorly controlled in follow-up examinations through July 2004.[13]  (Id. at 450)

On March 31, 2004, Dr. Fucci completed a Diabetes Mellitus Residual Functional Capacity Questionnaire.  (Id. at 383-86)  Dr. Fucci stated that he saw plaintiff monthly

--------

[13] Dr. Duggal noted plaintiff's uncontrolled diabetes on November 3, 2004 (Id. at 446), December 2, 2003 (Id. at 447), February 17, 2004 (Id.) and July 27, 2004 (Id. at 450).  On April 7, 2005, plaintiff's diabetes was controlled but poor.  (Id. at 451)

and that she experienced fatigue, difficulty walking, episodic vision blurriness, bladder

infections, swelling, chronic skin infections, general malaise, muscle weakness,

nausea/vomiting, and extremity pain and numbness.  (Id. at 383)  He assessed plaintiff

to be capable of sitting one hour at a time and standing ten minutes at a time.  (Id. at

384)  In a total eight hour day, Dr. Fucci opined that plaintiff could sit and stand/walk

less than two hours.  (Id.)  Dr. Fucci determined that plaintiff's legs required elevation at

a forty-five degree angle when sitting for prolonged periods.  (Id. at 385)  Dr. Fucci also

stated that plaintiff required a job that permitted her to shift positions at-will.  (Id.)

Plaintiff's other work-related limitations included:  (1) occasionally lifting less than ten

pounds; (2) rarely twisting and (3) never stooping/bending, crouching/squatting,

climbing ladders and stairs.  (Id.)  Moreover, Dr. Fucci predicted that plaintiff would

need excused absences from work for more than four days per month.  (Id. at 386)

        In October 2004, Dr. Fucci referred plaintiff to Dr. Randeep S. Kahlon for an

evaluation of her bilateral hand pain and paresthesias.[14]  (Id. at 420)  Dr. Kahlon

determined that plaintiff had bilateral carpal tunnel syndrome and severe tendinitis flare

up on her left side, worse than the right, secondary to her underlying lupus.  (Id.)  On

November 11, 2004, Dr. Kahlon noted that plaintiff experienced persistent pain and

gave her two injections in her left wrist for treatment.  (Id. at 419)  On December 22,

2004, plaintiff underwent surgery for a left carpal tunnel release and a left wrist de

Quervain's release.[15]  (Id. at 416-17)  Plaintiff reported doing well with no pain or

_____

        [14] Paresthesias is a skin sensation, commonly known as "pins and needles."

        [15] A carpal tunnel release is a surgical procedure.  During surgery, the surgeon
divides the ligament that forms the top of the carpal tunnel in two, preventing the

12

paresthesias in her left hand in follow-up examinations in January and February 2005.

(Id. at 414-15)  On March 18, 2005, plaintiff underwent a successful right carpal tunnel

release, with no paresthesias in her right hand following the surgery.  (Id. at 452-56)

On March 9, 2005, Dr. Young K. Kim examined plaintiff at the Commissioner's

request.[16]  (Id. at 424-34)  Plaintiff had normal range of motion in her hands, wrists,

knees and ankles.  (Id. at 425)  She had mild tenderness in these areas, but no

swelling.[17]  (Id.)  She also had normal range of motion of her cervical spine, and limited

trunk flexion of her lumbar spine with moderate tenderness in her lumbosacral muscles.

(Id. at 425, 430)  On the neuromuscular examination, Dr. Kim reported that plaintiff had

decreased sensation along her right fingers, and decreased sensation along her

bilateral big toes.  (Id. at 426)  Dr. Kim found the muscle strength of both her upper and

lower extremities to be normal, except for some decreased grip strength in both hands.

(Id. at 426-27)  With respect to plaintiff's gait, Dr. Kim determined it was abnormal and

bilateral antalgic.[18]  (Id. at 426)  Dr. Kim also noted that plaintiff required her quad cane

for long distance ambulation.  (Id.)  Based on his examination, Dr. Kim opined that

plaintiff's limits consisted of:  (1) 3-4 hours of walking and standing during an 8-hour day

due to pain in her feet, ankles, and knees; and (2) sitting for 4-6 hours during an 8-hour

_____

ligament from pressing down on the nerves inside the tunnel.  A de Quervain's release
is a surgery that opens the inflamed tunnels, or sheaths, that the tendons pass through.

[16] The record indicates that Dr. Kim examined plaintiff once.

[17] Dr. Kim's evaluation occurred a few days before plaintiff's right carpal tunnel
surgery on March 18, 2007. (Id. at 452-54)

[18] Antalgic describes a way of walking that alleviates or allays pain.

13

day due to her low back pain.  (Id. at 426)  Additionally, Dr. Kim imposed a weight restriction limiting lifting to 15-20 pounds.  (Id.)

On March 16, 2005, plaintiff sought treatment at Interventional Spine Pain Consultants ("ISPC") for pain in her cervical and occipital regions.  (Id. at 457-58)  At ISPC, plaintiff was treated by Dr. James Downing.  (Id.)  Plaintiff received treatment several times from ISPC.[19]  Dr. Downing found plaintiff to ambulate with a four-point cane, walk with a moderately antalgic but stable gait, possess normal coordination, experience no neck point tenderness, and have normal motor strength in both her upper and lower extremities.  (Id. at 458)  Based on these findings, Dr. Downing diagnosed plaintiff with mild paravertebral muscle tension and spasm in her lumbar spine.  (Id.)  In conclusion, Dr. Downing found that plaintiff had axial and radicular cervical symptoms with a relatively unremarkable physical exam.  (Id.)  Consistent with his conclusions, Dr. Downing recommended an MRI of plaintiff's cervical spine.  (Id.)

In a follow-up examination in April 2005, plaintiff continued to complain of neck pain and headaches.  (Id. at 459-60)  Dr. Downing reviewed the MRI of her cervical spine, which showed degenerative changes most prominently at the C3-C4 level.  (Id. at 460)  The MRI did not indicate any significant foraminal or central canal stenosis, or disc herniations at any level.[20]  (Id.)  Dr. Downing diagnosed cervical spondylosis, and recommended a series of C3-C4 and C4-C5 cervical facet joint injections to improve

---

[19] Plaintiff received care from ISPC on March 16, 2005, April 13, 2005, April 21, 2005, May 5, 2005, June 8, 2005, November 9, 2005 and November 28, 2005.  (Id. at 457, 459, 461, 463, 497-99)

[20] Stenosis is an abnormal narrowing in a blood vessel or other tubular organ or structure.

14

plaintiff's cervical pain.[21]  (Id. at 460-61)  Plaintiff received these injections in April and

May 2005.  (Id. at 461-63)  Plaintiff reported some improvement following the April 2005

injection.  (Id. at 463)

Beginning in March 2004, plaintiff also received treatment for major depression

from Dr. Oscar E. Galvis, a psychiatrist.  (Id. at 464)   According to plaintiff, she saw Dr.

Galvis every six weeks for a session.[22]  (Id. at 84)  Medical treatment records from Dr.

Galvis indicated plaintiff's mental condition to be depressed and stressed.  (Id. at 438-

39, 441-43)  Dr. Galvis prescribed psychotropic medications and plaintiff responded

well to them.  (Id. at 438, 464)  On May 2, 2005, Dr. Galvis completed a Mental

Impairment Questionnaire.  (Id. at 464-69)  Dr. Galvis diagnosed plaintiff with recurrent

moderate depression and found plaintiff to have a GAF of 50.[23]  (Id. at 464)  He also

found plaintiff to have low energy, low motivation, high irritability, crying spells, high

social isolation, dysphoric mood and high anxiety.  (Id.)  He opined that plaintiff could

not meet competitive standards in all mental abilities and aptitudes necessary to do

unskilled work.  (Id. at 466-67)  On the form, the "unable to meet competitive standards"

column is checked when a patient "cannot satisfactorily perform this activity

---

[21] Spondylosis is spinal degeneration that occurs when the joints of two or more vertebrae are deformed.

[22] The court notes that Dr. Galvis's form indicates that he evaluated plaintiff monthly.  (Id. at 464)

[23] The GAF, or Global Assessment of Functioning, is a numeric scale ranging from 0 to 100.  The GAF is used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults.  A GAF of 50 indicates either serious symptoms or any serious impairment in social, occupational, or school functioning.

independently, appropriately, effectively and on a sustained basis in a regular work setting." (Id. at 466)  Dr. Galvis also indicated that, due to plaintiff's mental condition, she had a complete inability to function outside a highly supportive living arrangement or outside the area of her home.  (Id. at 468)

### C. Hearing Before ALJ

#### 1. Plaintiff testimony

Plaintiff was 32 years old at the time of the ALJ's decision.  (Id. at 68)  She has an eleventh grade education and past work experience as a cook, kitchen worker, cashier and dispatcher.  (Id. at 69, 176, 181, 184)  Plaintiff is married and has two children, ages 10 and 12.  (Id. at 68, 78)  She weighs 234 pounds and is five foot two. (Id. at 69)

At the hearing, plaintiff testified that her medical problems started in 1995, approximately ten years prior to the hearing.  (Id. at 69)  Plaintiff worked until the beginning of August 2002.  (Id. at 70)  Plaintiff alleges that, in August 2002, her disability prevented her from working and that, from the time she stopped work until the hearing, her condition progressively worsened.  (Id.)  At the time of the hearing, plaintiff received care from a rheumatologist, family doctor, spine care doctor and an endocrinologist.  (Id.)  Additionally, plaintiff had prescriptions for at least thirteen different medications.[24]  (Id. at 71-73, 86, 487-88)  Despite these medications and other

---

[24] Plaintiff took Plaquenil and Methotrexate for lupus, Neurontin and Naproxen for neuropathy, Fluoxetine and Lorazepan for anxiety, Fioricet and Lamictal for migraines, Zanaflex and Temazepam for insomnia, Percocet and Quinine Sulfate for pain, Aciphex and Reglan for digestion, Lipitor for high cholesterol, and used a diabetes pump to help maintain her blood sugar. (Id. at 71-73, 86, 487-88)

16

forms of relief, plaintiff testified that her pain was "unbearable."[25]  (Id. at 73)  Other

treatments that plaintiff used to alleviate her pain included:  elevating her feet,[26] using a

TENS unit, propping herself up with pillows and applying heat or ice when needed.  (Id.)

Plaintiff's daily routine consists of getting up around 4 a.m. every morning.  (Id. at

77)  She wakes up her children and puts them on the bus, but the children do

everything else to get ready for their day at school.  (Id. at 77-78)  Plaintiff spends the

rest of the day trying to make herself comfortable and occasionally reads and watches

television.  (Id. at 77-79)  Plaintiff does not make her bed because she is generally in

and out of it every couple of hours.  (Id. at 79)  With respect to chores and cleaning,

plaintiff testified that she grocery shops at most once a month, very seldom cooks, and

never takes out the trash or does yard work.[27]  (Id. at 77-80)  Further, plaintiff drives, at

most, fifteen miles per week.[28]  (Id. at 77)   Generally, she avoids leaving the house

unless it is necessary.  (Id.)

Plaintiff also testified about her limitations.  (Id. at 75-79)  Specifically, she felt

that she was capable of sitting for eight to ten minutes before becoming uncomfortable

and could walk twenty-five to fifty feet before stopping.  (Id. at 75)  She requires the use

---

[25] Plaintiff's back problems stem from her involvement in a car accident when
she was fourteen years old.  (Id. at 88)  Plaintiff described the pain as coming "from
[her] lower back and radiat[ing] down her legs and feet."  (Id.)

[26]Elevating her feet helps the plaintiff to reduce the swelling in her legs and feet,
which is caused by the neuropathy.  (Id. at 92)

[27] Plaintiff's family members take care of day-to-day necessities. Moreover, when
plaintiff grocery shops, she uses a motorized cart.  (Id. at 75)

[28] She avoids taking Percocet when driving because it makes her sleepy.  (Id. at
82)

of her quad cane when she is not in her home and, when she is at home, uses furniture

to support herself and help maintain her balance.  (Id. at 76)  Additionally, plaintiff

claimed that she suffers from migraines three to four times per week.  Plaintiff's

migraines are accompanied with nausea, vomiting, and sensitivity to light and sound.

(Id. at 74)  When suffering from a migraine, plaintiff typically makes the room dark and

quiet, and lies in bed.  (Id.)  She testified that activity aggravates her migraines.  (Id.)

With respect to her mental condition, plaintiff stated that she sees Dr. Galvis every six

weeks for a session.  (Id. at 84)  Plaintiff also testified that she cries every day for half

an hour primarily caused by memories of her recently deceased mother.  (Id. at 83-84)

In addition, plaintiff claimed that she has some trouble relating to people.  (Id. at 83)

At the hearing, plaintiff testified about her current medical conditions.

Specifically, plaintiff stated that surgery was performed on both her hands to correct the

carpal tunnel syndrome.  (Id. at 86)  She no longer experienced swelling in her hands,

although the pain and stiffness remained.  (Id.)  She was experiencing a renewal of

problems with her digestive system, but medication was helping.  (Id.)  Her lupus and

back pain were still present.  (Id. at 86-87)  She admitted that her diabetes was

controlled.  (Id. at 88)  Additionally, she testified that she had asthma, which was

treated with an Advair disc, Albuterol inhaler, and use of a nebulizer three times per

month.  (Id.)

### 2. Vocational expert testimony

After the vocational expert discussed plaintiff's past relevant work,

the ALJ asked the vocational expert, Mr. Tony Melanson, to assume a hypothetical

individual with plaintiff's vocational characteristics and give an opinion as to whether

such a hypothetical individual could perform a significant number of jobs in the

economy.  (Id. at 91-94)  The following exchange occurred between the ALJ, vocational

expert and plaintiff:

> ALJ:  I'd like for you to assume a person who's 28 years – or hypothetical
> for a person who's 28 years of age on her onset date.  Has an 11th grade
> education.  You never did get your GED?

At this juncture, the ALJ elicited from plaintiff that she failed to acquire her GED

because she did not have enough time.  (Id. at 91)  The ALJ continued:

> ALJ:  Okay.  And she's a right-handed individual.  Past relevant work as
> just indicated.  Suffering from various impairments.  She has some
> diabetes.  It's controlled by her medication, along with her asthmatic
> condition.  Her lupus is still current.  That she says causes fatigue, along
> with her asthmatic condition.

(Id. at 91)  Here, the ALJ inquired whether and where the plaintiff experienced swelling.

(Id. at 91-92)  Plaintiff's response indicated that her feet and legs swell.  (Id.)  In

response to the ALJ's question as to the frequency and extent of swelling, plaintiff

answered that her legs "swell pretty much every day" and that her feet swell so that she

"can't even get them into my shoes half the time."  (Id. at 92)  Moreover, plaintiff

indicated that elevation reduced the swelling somewhat and that the swelling is caused

by her diabetic neuropathy even though it is controlled.  (Id.)  In response, the ALJ

continued with his hypothetical:

> ALJ:  And has some neuropathy as a result of her diabetic condition.  She
> indicates in her testimony she has headaches three to four times a week,
> and depression more or less – more on the side of anxiety, according to
> her testimony.  All of which are somewhat relieved by her medications
> without significant side effects.  And would need jobs, Mr. Melanson,
> would allow her to sit, stand, low concentration, low stress, low memory
> level jobs.  And according to the file, would be mildly limited as to push
> and pull on that right upper extremity.   But that's been fixed since May,
> you think, of '05?  You've had a surgery on that?

PL:  Yes.

ALJ:  Okay.  And no prolong climbing, balancing, stooping, stair climbing, heights, or moving machinery due to her imbalance.  And jobs that would allow her to on occasion to elevate her feet off of weight-bearing on occasion.  And avoid dust, odors, gases, fumes, like substances.  She also has some obesity.  She indicates she weighs 234 pounds at this time with a 5'2" frame, but would be able to do sedentary work activities with those limitations.  Are there jobs, Mr. Melanson, such a person can do, in your opinion . . . in significant . . . numbers?

(Id. at 92-93)  The vocational expert testified that such a hypothetical individual could perform a significant number of unskilled, sedentary jobs in the national and regional economies.  (Id. at 93-94)  These jobs included inspector/tester, security monitor, and telephone surveyor.  (Id.)

On examination by plaintiff's attorney, the vocational expert indicated that the accepted rate of absenteeism for the jobs was approximately two days per month.  (Id. at 95)  Further, the vocational expert testified that unscheduled breaks, emotionally breaking down, and the need to lie down during the day would be unacceptable to the employers of the identified jobs.  (Id. at 95-96)  The vocational expert also acknowledged that when the hypothetical individual required an elevation of more than an inch within the hypothetical situation, the inspector/tester and telephone surveyor positions were eliminated from those jobs existing in significant numbers in the regional and national economies.  (Id. at 97-98)  Additionally, plaintiff's attorney asked the vocational expert to identify whether a person with the limitations marked on Dr. Galvis's residual function capacity form could perform any substantial gainful activity.  (Id. at 99)  In the vocational expert's opinion, a person with those identified limitations would be unable to perform any substantial gainful activity.  (Id.)

20

## III. STANDARD OF REVIEW

Findings of fact made by the Commissioner are conclusive, if they are supported by substantial evidence.  Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision.  See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).  In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record.  See id.  In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. See id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence.  As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56.  The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the

21

governing law, there can be but one reasonable conclusion as to the verdict.  If

reasonable minds could differ as to the import of the evidence, however, a verdict

should not be directed."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51

(1986) (internal citations omitted).  Thus, in the context of judicial review under

§ 405(g), "[a] single piece of evidence will not satisfy the substantiality test if the

[Commissioner] ignores, or fails to resolve, a conflict created by countervailing

evidence.  Nor is evidence substantial if it is overwhelmed by other

evidence–particularly certain types of evidence (e.g., that offered by treating

physicians)–or if it really constitutes not evidence but mere conclusion."  See Brewster

v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) (quoting Kent v. Schweiker, 710 F.2d 110,

114 (3d Cir. 1983)).  Where, for example, the countervailing evidence consists primarily

of the plaintiff's subjective complaints of disabling pain, the Commissioner "must

consider the subjective pain and specify his reasons for rejecting these claims and

support his conclusion with medical evidence in the record."  Matullo v. Bowen, 926

F.2d 240, 245 (3d Cir. 1990).

## IV.  DISCUSSION

### A.  Disability Determination Process

Eligibility for DIB under the Social Security Act is conditioned on compliance with

all relevant requirements of the statute.  See 42 U.S.C. § 423(a).  The Social Security

Administration is authorized to pay DIB to persons who are "disabled."  42 U.S.C. §

423(a)(1)(E).  A claimant is disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  See 42 U.S.C. § 423(d)(2)(A); Barnhart v. Thomas, 540 U.S. 20, 21-22 (2003).  To determine disability, the Commissioner uses a five-step sequential analysis.  See 20 C.F.R. § 404.1520; Plummer v. Apfel, 186 F.3d 422, 427-28 (3d Cir. 1999).  If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further.  20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity.  See 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity).  If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe.  See 20 C.F.R. § 404.1520(a)(4)(ii) (requiring finding of not disabled when claimant's impairments are not severe).  If claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listing") that are presumed severe enough to preclude any gainful work.[29]  See 20 C.F.R. § 404.1520(a)(4)(iii); Plummer, 186 F.3d at 428.  When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled.  See 20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five.  See

---

[29] Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months.  See 20 C.F.R. §§ 404.1520(a)(4)(ii-iii).

20 C.F.R. § 404.1520(d).[30]

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work.  See 20 C.F.R. § 404.1520(a)(4)(iv) (stating a claimant is not disabled if able to return to past relevant work); Plummer, 186 F.3d at 428.  "The claimant bears the burden of demonstrating an inability to return to her past relevant work."  Plummer, 186 F.3d at 428.  If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work.  See 20 C.F.R. § 404.1520(g) (mandating that a claimant is not disabled if the claimant can adjust to other work); Plummer, 186 F.3d at 428.  At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits.  See Plummer, 186 F.3d at 428.  In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC.]"  Id.  This determination requires the Commissioner to consider the cumulative effect of the claimant's impairments and a vocational expert is often consulted.  Id.

**B. Whether the ALJ's Decision is Supported by Substantial Evidence**

On appeal, plaintiff presents three arguments:  (1) that there is not substantial

---

[30] Prior to step four, the Commissioner must assess the claimant's residual functional capacity ("RFC").  See 20 C.F.R. § 404.1520(a)(4).  A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]."  Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001) (quoting Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000)

evidence in the record to support the ALJ's finding that plaintiff's diabetes is controlled; (2) that the ALJ improperly weighed the opinions of her treating physician and psychiatrist; and (3) that the ALJ posed an inadequate hypothetical to the vocational expert at the hearing.   (D.I. 13 at 13-16)   Specifically, plaintiff asserts that the ALJ improperly credited Dr. Kim's opinion over Dr. Fucci's in determining plaintiff's RFC and objects to the ALJ's rejection of Dr. Galvis's RFC assessment.   (Id. at 13-15)

### 1. ALJ's finding that plaintiff's diabetes is controlled

Several factual conclusions underlie the ALJ's RFC determination, which the court concludes are supported by substantial evidence as discussed below.

The ALJ found that plaintiff had the RFC to

> perform sedentary exertional work with a sit or stand option, limited pushing and pulling, and no prolonged climbing balancing, stooping, or stair climbing, or concentrated exposure to heights and moving machinery due to her imbalance, and requiring low memory, low concentration, and involving low stress work, and allowing for occasional leg elevation, with limited exposure to fumes, odors, dusts, gases, and other pulmonary irritants.

(D.I. 10 at 27-28)   Plaintiff's medical records exhibit an individual with various diseases and abnormalities, including diabetes, allergies, asthma, lupus, back pain, neuropathy, tenderness, swelling and limited range of motion in some joints.   (Id. at 69, 175, 249-52, 278)   With respect to plaintiff's diabetes, plaintiff points to Dr. Duggal's record from February of 2004, which indicates that plaintiff's diabetes remained uncontrolled even after her use of the insulin pump.   (D.I. 13 at 13; D.I. 10 at 448)   Conversely, plaintiff admitted at the June 2005 hearing that her diabetes was controlled and there is evidence in the record to suggest that plaintiff's diabetes was controlled for a few

25

months in 2003.[31]   (D.I. 10 at 88, 278, 396)  Plaintiff's attorney argued at the hearing

that plaintiff's opinion, with respect to her diabetes, was a lay opinion and that the ALJ

should instead rely on plaintiff's physicians' opinions.  (Id. at 103)  Under the

regulations, the ALJ properly considered plaintiff's opinion regarding her diabetes.  See

20 C.F.R. § 404.1529(a) (describing "other evidence" to be considered, including

"statements or reports" from claimant).  There is substantial evidence in the record to

support the ALJ's conclusion that plaintiff's diabetes is controlled.  See Fargnoli, 247

F.3d at 38.

　　　　Plaintiff also suffers from diabetic neuropathy.  (D.I. 10 at 277)  The ALJ

determined that plaintiff's neuropathy is mild.  (Id. at 25)  Dr. Mueller described

plaintiff's neuropathy as mild.  (Id. at 249)  Dr. Javed, plaintiff's rheumatologist, noted

improvement in plaintiff's neuropathy from taking Plaquenil.  (Id. at 277-78)  Moreover,

Dr. Mueller's description is consistent with the objective medical evidence in that

plaintiff's MRIs were near normal.  (Id. at 277-78)  Given plaintiff's admission, her

medical records and Dr. Duggal's suspicions, substantial evidence exists to support the

ALJ's determination that plaintiff's diabetes is controlled and her neuropathy mild.[32]

---

[31] Moreover, plaintiff's argument ignores Dr. Duggal's suspicions that plaintiff
failed to follow her treatment plan.

[32] In her brief, plaintiff takes issue with the ALJ's finding that her diabetes was
controlled and asserts that her "consistent multiple severe complaints" required a
different RFC determination than the ALJ's.  (D.I. 13 at 13-15)  Although plaintiff does
not address additional specific bases for error in the ALJ's RFC, the court notes that
substantial evidence exists to support the ALJ's determinations regarding plaintiff's
severe physical impairments of lupus and obesity.
　　　　Specifically, the ALJ held that evaluation of plaintiff's lupus is continuing.  (D.I. 10
at 28)  The ALJ noted that the EMG and MRI of plaintiff's neck is not consistent with
any impairment other than a connective tissue disease.  (Id.)  This determination is

See Monsour Med. Ctr., 806 F.2d at 1190.

## 2. Treating physician and psychiatrist opinions

To determine a treating source opinion's weight, the ALJ must weigh all evidence

and resolve any material conflicts.[33] See Richardson v. Perales, 402 U.S. 389, 399

(1971); Fargnoli, 247 F.3d at 43 (recognizing that the ALJ may weigh the credibility of

the evidence). The regulations generally provide that more weight is given to treating

source opinions; however, this enhanced weight is not automatic. See 20 C.F.R. §

404.1527(d)(2). Treating source opinions are entitled to greater weight when they are

supported by medically acceptable clinical and laboratory diagnostic techniques and are

not inconsistent with "other substantial evidence" in the record. 20 C.F.R. §

404.1527(d)(2); see Fargnoli, 247 F.3d at 43.

If a treating opinion is deemed not controlling, the ALJ uses six enumerated

factors to determine its appropriate weight. See 20 C.F.R. § 404.1527(d)(2-6). The

factors are:  (1) length of the treatment relationship; (2) nature and extent of the

---

supported by substantial evidence from Drs. Javed and Mueller's medical records. (Id. at 377) ("The patient had an EMG and MRI of her neck done with findings not consistent with anything else other than a connective tissue disease.")); (Id. at 277) (noting possible connective tissue disease)). Additionally, plaintiff is considering gastric bypass surgery to help with her obesity and Dr. Fucci agrees that it would be a helpful procedure for her. (Id. at 371)

[33] The court notes that the ALJ's review and determination of weight for a treating physician's opinion is not unlimited. "In choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion. Morales v. Apfel, 225 F.3d 310, 317-18 (3d Cir. 2000) (citing Plummer, 186 F.3d at 429; Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988); Kent v. Schweiker, 710 F.2d 110, 115 (3d Cir. 1983)).

treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors.  See id.  The supportability factor provides that "[t]he better an explanation a source provides for an opinion, the more weight [the ALJ] will give that opinion."  20 C.F.R. § 404.1527(d)(3).  Similarly, the consistency factor states that the "more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion."  20 C.F.R. § 404.1527(d)(4).

### a. Dr. Fucci's RFC assessment

In the case at bar, plaintiff argues that the ALJ erred because he "assumed [Dr. Kim's] opinion was the correct opinion and used it as the basis for rejecting the opinion of Dr. Fucci."  (D.I. 13 at 14)  The ALJ rejected Dr. Fucci's RFC assessment because the record lacked objective evidence to support his conclusions that plaintiff possessed a less than sedentary ability for low stress work and noted its inconsistency with Dr. Kim's RFC assessment.[34]  (D.I. 10 at 27-28)  In so doing, the ALJ did not reject Dr. Fucci's conclusions in toto, but determined that Dr. Fucci's opinion was not entitled to controlling weight.  See 20 C.F.R. § 404.1527(d)(2).

Substantial evidence supports the ALJ's determination that Dr. Fucci's opinion is not entitled to controlling weight.  See id.  First, as found by the ALJ, Dr. Fucci's RFC

---

[34] The inconsistency is apparent when the RFCs of Dr. Fucci and Dr. Kim are compared as they relate to plaintiff's standing and sitting tolerance.  Dr. Fucci's RFC form found plaintiff incapable of performing even low stress jobs and limited plaintiff to sitting for one hour and standing for ten minutes at a time before a break.  (D.I. 10 at 384)  He also determined plaintiff unable to lift less than 10 pounds, but found no limits on plaintiff's ability to use her hands, fingers, and arms for grasping, manipulating, or reaching for objects.  (Id. at 385)  In contrast, Dr. Kim assessed plaintiff capable of standing and sitting for three to four hours and sitting for four to six hours during an eight hour day.  (Id. at 426)

assessment is not supported by objective documentation.  Dr. Fucci's records indicate that he treated plaintiff for a variety of ailments and believed that plaintiff is unable to work, but do not evidence that plaintiff is unable to perform even sedentary work.  (D.I. 10 at 387-411)  Moreover, plaintiff asserts that Dr. Fucci's opinion is supported by objective medical criteria, but does not point to any in the record.  (D.I. 13 at 15)  Second, "other substantial evidence" exists in the record that is inconsistent with plaintiff's assertion.  See 20 § C.F.R. 404.1527(d).  Her medical records and Dr. Kim's assessment indicate that plaintiff's RFC is greater than Dr. Fucci's determination.  (D.I. 10 at 278, 387, 424-34, 457-58)  In particular, other physical findings from her medical records showed that plaintiff had intact sensory ability, steady gait despite using her quad cane, normal motor strength in both her upper and lower extremities and no muscle atrophy.  (Id. at 278, 387, 457-58)

With respect to Dr. Kim's evaluation, plaintiff argues that the ALJ improperly considered it because Dr. Kim's opinion is "devoid of any explanation."  (D.I. 13 at 15)  Contrary to plaintiff's assertion, Dr. Kim's report indicates his awareness of plaintiff's medical history and his results from a physical and neuromuscular examination of plaintiff.  (D.I. 10 at 424-30)  His report shows abnormalities in the grip strength of plaintiff's hands and abnormal flexion in the lumbar spine region.  (Id.)  All other findings from the range of motion exam conducted by Dr. Kim were normal.  (Id. at 427-30)

Because Dr. Kim's findings and plaintiff's own medical records are inconsistent with Dr. Fucci's RFC determination, the ALJ was required to determine the appropriate amount of weight to afford to Dr. Fucci's opinion.  See 20 C.F.R. § 404.1527(d)(2).  The ALJ properly used the supportability and consistency factors provided in the regulations

29

in his determination.  See 20 C.F.R. §§ 404.1527(d)(3) - (4).  He noted that Dr. Fucci's RFC determination lacked support and found it inconsistent with the other evidence of record.  (D.I. 10 at 27-29)  Accordingly, the ALJ did not err in affording significant weight to Dr. Kim's opinion based on his conclusion that it was more in proportion to the objective findings than Dr. Fucci's.  See (D.I. 10 at 28).  For the reasons stated above, the court finds that the ALJ's determination that Dr. Fucci's RFC assessment was not entitled to controlling weight is supported by substantial evidence.

### b.  Dr. Galvis's RFC assessment

Plaintiff argues that the ALJ improperly rejected Dr. Galvis's RFC assessment because Dr. Galvis is plaintiff's treating psychiatrist, no conflicting medical evidence existed, and the ALJ improperly interpreted the significance of a GAF score of 50.  (D.I. 13 at 15)  The ALJ found that the Dr. Galvis's medical treatment records showed that plaintiff suffered from depression, but did not support the debilitating level of mental capacity asserted by the doctor on his RFC form.  (D.I. 10 at 29)  The ALJ rejected Dr. Galvis's RFC opinion for three reasons: (1) internal inconsistency; (2) lack of support from medical records; and (3) its brief and conclusory nature.  (Id.)

Dr. Galvis found plaintiff "unable to meet competitive standards" in all categories on his RFC assessment.  (Id. at 466)  "Unable to meet competitive standards" means that plaintiff "cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting."  (Id.)  Dr. Galvis also indicated that plaintiff demonstrated a "complete inability to function independently outside the area" of her home.  (Id. at 468)  The ALJ found these assessments to be "intrinsically inconsistent" with Dr. Galvis's GAF score of 50 because a GAF of 50 is

30

inconsistent with an individual who allegedly has a complete inability to function outside of her home.  (Id. at 29)  The RFC form defines "seriously limited, but not precluded" to mean the ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances."  (D.I. 10 at 466)  "A GAF score falling between 41 and 50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'"  Torres v. Barnhart, 139 Fed. Appx. 411, 415 n.4 (3d Cir. 2005) (non-precedential) (quoting Boyd v. Apfel, 239 F.3d 698, 702 (5th Cir. 2001)).

Plaintiff argues that the ALJ impermissibly mixed the definition of serious as used on the RFC form with its meaning in the GAF score context.  (D.I. 13 at 16)  The Commissioner interprets the ALJ's "overall point" to be that a GAF of 50 is "still inconsistent with an individual who supposedly has a complete inability to function outside a highly supportive living arrangement or outside the area of her home."  (D.I. 15 at 17)  Based on the above, the ALJ used the wrong definition when he interpreted Dr. Galvis's RFC assessment; therefore, the court finds that this determination is not supported by substantial evidence.  However, the ALJ also rejected Dr. Galvis's RFC determination because the medical records did not support the debilitating level of mental capacity asserted on the RFC form and because the ALJ found Dr. Galvis's opinion to be "brief, conclusory, and inadequately supported by clinical findings."[35]  (D.I.

---

[35] As discussed below, substantial evidence supports the alternative bases for the ALJ's rejection of Dr. Galvis's RFC assessment, rendering the misapplication of the definition for "serious" harmless error.

10 at 29)

As discussed above, the regulations state that a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). Plaintiff argues that the ALJ improperly discounted Dr. Galvis's RFC assessment because contrary medical evidence did not exist. (D.I. 13 at 16) In the case at bar, the ALJ determined that plaintiff's own medical records were inconsistent with the record and Dr. Galvis's RFC assessment. (D.I. 10 at 29) Plaintiff's medical records show her to experience depression, anxiety and stress, with a good response to psychotropic medications; however, there is limited evidence to support serious functional limitations.[36] (Id. at 82-83, 436-37, 439-40, 442-43, 463) Plaintiff testified that she sniped at people, is irritated, cried every day due to memories of her deceased mother and experienced moods. (Id. at 82-83) Again, the ALJ properly determined the appropriate weight to be given to Dr. Galvis's RFC determination using the supportability and consistency factors in the regulations. See 20 C.F.R. § 404.1527(d)(3-4); (D.I. 10 at 28-29). Based on this evidence, the court concludes that there is substantial evidence to support the ALJ's determination that Dr. Galvis's RFC assessment is not entitled to controlling weight. See Fargnoli, 247 F.3d at 38.

### 3. The ALJ's hypothetical

Plaintiff's last asserted basis for error is the hypothetical that the ALJ posed to

---

[36] Plaintiff did indicate that she has suicidal thoughts a few times a month. (D.I. 10 at 82-83)

32

the vocational expert at the hearing.  (D.I. 13 at 16)  "A hypothetical question must

reflect all of a claimant's impairments that are supported by the record; otherwise the

question is deficient and the expert's answer to it cannot be considered substantial

evidence."  Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).  "Limitations that

are medically supported but are also contradicted by other evidence in the record may

or may not be found credible – the ALJ can choose to credit portions of the existing

evidence but 'cannot reject evidence for no reason or for the wrong reason.'"

Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (quoting Mason v. Shalala,

994 F.2d 1058, 1066 (3d Cir. 1993)).  In the case at bar, plaintiff argues that the ALJ

employed vague and non-specific descriptions of plaintiff's impairments.  (D.I. 13 at 16)

Specifically, plaintiff argues that the following phrases did not provide the vocational

expert with enough information to properly answer the hypothetical:  "has some

diabetes," "it's controlled by her medication," "lupus is still current," "causes fatigue,"

"has some neuropathy," headaches which are "somewhat relieved" by medication, "low

concentration," low stress," and "low memory level."[37]  (Id. at 16-17)  The ALJ is

required to submit to the vocational expert only those impairments that are credibly

established by the record.  Rutherford, 399 F.3d at 554.  The impairments recounted by

---

[37] Challenges to the adequacy of hypothetical questions posed to a vocational expert often occur in two forms:  "(1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment," or "(2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert."  Rutherford, 399 F.3d at 554 n.8.  The second type of challenge is essentially a challenge to the RFC assessment itself.  See id.  Plaintiff's argument challenges the phrasing of the limitations to the vocational expert and, as such, is within the first category.  See id.

the ALJ accurately reflected all impairments and, therefore, the vocational expert's response to the hypothetical constitutes substantial evidence.[38]  See Chrupcala, 829 F.2d at 1276.

## V. CONCLUSION

For the reasons stated above, the ALJ's decision is supported by substantial evidence.  Plaintiff's motion for summary judgment is denied.  Defendant's motion for summary judgment is granted.  An appropriate order shall issue.

_____

[38] Plaintiff also challenges the ALJ's hypothetical because she claims that the ALJ effectively took back any prior limitations he provided when he told the vocational expert that plaintiff "would be able to do sedentary work activities with those limitations." (D.I. 13 at 17) (quoting D.I. 10 at 92-93)  Plaintiff's argument lacks merit because, on its face, the ALJ statements imposes the prior limitations.  (D.I. 10 at 92-93)